# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50295 | **DATE** | July 10, 2001 |
| **CASE TITLE** | | KOHLBAUER v. MASSANARI | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached report, it is the Magistrate's recommendation that Defendants motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied. Enter attached Report and Recommendation.

(11) ■ [For further detail see reverse/attached order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | number of notices | |
| | Notified counsel by telephone. | | 15 |
| | Docketing to mail notices. | JUL 10 2001 | |
| | Mail AO 450 form. | date docketed | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| TML | courtroom deputy's initials | date mailed notice | |
| | | U.S. DISTRICT COURT CLERK 01 JUL 10 AM 10:24 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

FILED
JUL 10 AM 10: 25

CLERK
U.S. DISTRICT COURT

DOCKETED
JUL 1 0 2001

|  |  |  |
|---|---|---|
| DEBRA KOHLBAUER, | ) | |
| Plaintiff, | ) | Case No. 00 C 50295 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| LARRY G. MASSANARI, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Debra Kohlbauer, (Plaintiff) seeks judicial review of the final decision of the

Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§405(g),

1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance

Benefits (DIB) or Social Security Income (SSI) pursuant to Title XVI of the Social Security Act (the

Act). 42 U.S.C. §§461(i), 423(d) and 1382(c). This matter is before the Magistrate Judge for Report

and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.   BACKGROUND

Plaintiff applied for DIB and SSI effective November 12, 1998. On January 25, 1999,

Plaintiff was sent an initial determination notice denying her benefits. (Tr. 22-25). Plaintiff filed

her request for reconsideration on March 30, 1999. (Tr. 26). On June 24, 1999, Plaintiff's request

for reconsideration was denied. (Tr. 27-29). Plaintiff then requested a hearing before an

Administrative Law Judge (ALJ) on July 19, 1999. (Tr. 30-31). On November 9, 1999, Plaintiff

appeared, with counsel, for her hearing before the ALJ. (Tr. 246-278). On November 26, 1999, the

ALJ issued a decision denying Plaintiff benefits. (Tr. 10-18). On December 2, 1999, Plaintiff filed a request for review of the hearing decision. (Tr. 7). On July 26, 2000, the Appeals Council notified Plaintiff that her request for review of the ALJ's decision was denied and the ALJ's decision stands as the final decision of the Commissioner. (Tr. 5-6).

## II    FACTS

Plaintiff was born on February 15, 1961, and was 38 years old at the time of the hearing. (Tr. 251). Plaintiff testified that she graduated from high school at Freeport High School in Freeport, Illinois. (Tr. 252). Plaintiff testified that she did not have any vocational training and that her last job was at Western States Insurance Company. (Tr. 252). She worked at Western as an insurance clerk until July 19, 1996. (Tr. 57). Her past work positions include assembler, mail coordinator, cashier, and supervisor. (Tr. 57). Plaintiff testified that when she first began working at Western in February of 1988, her job involved standing most of the time and lifting 20-30 pounds. (Tr. 57, 252). Plaintiff then began to assemble insurance polices at Western where she would sit three-fourths of the day. (Tr. 252). That job involved bending, twisting, lifting binders that weigh 15 pounds, lifting 30-40 pounds of computer paper, and carrying policies that weigh approximately 10 pounds. (Tr. 252). Plaintiff stated that she had no health problems when she stopped working at Western in 1996. (Tr.258). Plaintiff testified that in September of 1997 she began experiencing lower back pains and pain with the sciatic nerve. (Tr. 259). Plaintiff claims that she has a herniated disc at L5-S1, fibromyalgia and rheumatoid arthritis which affects her hands, feet and right knee with pain, stiffness, and swelling. (Tr. 259, 270). Plaintiff testified that the fibromyalgia affected her concentration, loss of memory, and the trigger points of her neck and lower back. (Tr. 259-60). She stated that about once a day when she is talking she forgets what she is about to say. (Tr. 274-75).

She also claims that her fibromyalgia condition causes fatigue, problems with lifting and causes her legs and feet to be sore and stiff. (Tr. 260). Plaintiff stated that she has problems with doing simple tasks because of the pain and stiffness she experiences daily. (Tr. 271). Plaintiff testified that she has to lie down for 30 minutes to an hour because of headaches. (Tr. 266, 277-278).

Plaintiff claimed that she could sit for 20-30 minutes before changing positions and stand for 30 minutes. (Tr. 277). When asked if she was experiencing any problems after sitting for approximately half an hour in the hearing room, Plaintiff testified that her shoulders and lower back were very sore and ached. (Tr. 260). She further stated that her legs were feeling very stiff. (Tr. 260). Plaintiff testified that she walks slowly and cannot walk very far without her legs and feet hurting. (Tr. 261). She also stated that she wears a knee brace on her right knee when she knows she will be walking some distance. (Tr. 263).

Plaintiff testified as to her activities of daily living as follows. (Tr. 265-276). Plaintiff testified that after walking for 30-40 minutes she has to sit down for a ten minute break and that the following day, she is very fatigued and her legs and lower back are very achy or throbbing with pain. (Tr. 265). Plaintiff also stated that at times, she gets headaches. (Tr. 265). She further stated that it is very stressful going to a store and when she goes grocery shopping, she does not put many groceries in the bag and that she cannot buy any heavy items until she is able to get someone to go with her. (Tr. 265, 268). Plaintiff also testified that she cooks for her family and helps with the laundry, such as folding and placing clothes in the washer. (Tr. 268).

Plaintiff claims that her hands are stiff and swollen in the morning when she first wakes up. (Tr. 263). When asked what happens when she writes a couple of lines with her right hand, she testified that her right hand cramps up and her writing starts to get messy. (Tr. 264). Plaintiff

testified that she is not able to garden anymore and that her husband and son had to put the garden in this past year. (Tr. 276). When asked about her sleeping, Plaintiff testified that without medication she can only sleep two to three hours a day and with medication, she can sleep six hours a day. (Tr. 262). Plaintiff stated that she is taking Neurotin on a daily basis which helps alleviate some of the pain with the sciatic nerve. (Tr. 273). She also takes Ultram and Celebrex to alleviate her arthritis pain and Flexeril to help her sleep at night. (Tr. 273-274). She further testified that she takes 2- 4 Tylenol pills two or three times a week. (Tr. 274).

As to driving, Plaintiff stated that because she lives in the country, she drives in a rural type area. (Tr. 269). She testified that if she had to drive for more than a half an hour, she would try to have someone drive for her because it would be more comfortable for her in the passenger seat. (Tr. 269). Plaintiff stated that the grocery store is about 15 minutes from her house. (Tr. 269). Plaintiff drives to drop her son off at kindergarten every day. (Tr. 275). She further stated that she drives her son to swimming once a week and soccer twice a week. (Tr. 275).

As to her ability to work, Plaintiff testified that if she was able to take breaks more often than previously allowed, she would be able to the jobs that she performed in the past. (Tr. 267). However, Plaintiff stated that she would not be able to lift as much as she used to when she performed her past work. (Tr. 267).

Ronald Gehrig, a vocational expert, also testified. (Tr. 281-287). Mr. Gehrig stated that Plaintiff's past work skill level and exertion demands were all unskilled work. (Tr. 282). He further testified that her last position at Western is considered light work. (Tr. 282). The ALJ then asked Mr. Gehrig whether an hypothetical individual of Plaintiff's age, 36-38 years old, with a 12th grade education and Plaintiff's work experience, who can lift up to 20 pounds occasionally, ten pounds

frequently, stand, sit, walk as required, climb, squat and only occasionally bend, but cannot work at unprotected heights, cannot do repetitive forceful gripping or do work that requires rapid finger dexterity is capable of performing work. (Tr. 282). Mr. Gehrig stated that within the region of Illinois, there are more than 115,000 suitable positions including: sales counter clerk: sedentary- 607, light 6,371; cashier: sedentary-26,248, light-72,445; receptionist: only sedentary-8,841; order clerk: sedentary-2,704, light-2,930; payroll clerk: sedentary-3,210; and dispatcher: sedentary-1,557. (Tr. 283). Mr. Gehrig was then asked what effect there would be on the available jobs if the individual required a sit-stand option so that she could change positions for a few minutes every hour and perform only occasional walking and then for less than a block at a time. (Tr. 283-284). Mr. Gehrig stated that all the aforementioned positions would be still be available. (Tr.284). The ALJ then asked what positions would be available if the individual could only maintain one or the other position for an hour so that she could sit only for an hour, and then stand for only an hour with the same limitations on walking. (Tr. 284). Mr. Gehrig testified that the option of sitting for an hour then standing for an hour does not exist, but that the individual could likely change positions for a few moments after sitting or standing after an hour. (Tr. 284). Mr. Gehrig replied that generally a person is allowed five minute breaks. (Tr. 284). Finally, the ALJ asked what effect there would be on the availability of jobs if this person must elevate their legs while seated. (Tr. 284). Mr. Gehrig replied that such a requirement would eliminate unskilled jobs. (Tr. 284). Mr. Gehrig further testified that if an individual could not work the cash register that the cashier jobs would be unavailable, but would not have a significant effect on the remaining available jobs. (Tr. 285). When asked what effect on the available jobs there would be if the person had to be absent once a month due to headaches, Mr. Gehrig stated that it would not make a difference on the available jobs because

generally in unskilled jobs, an individual would receive one sick day a month. (Tr. 285-286). He further testified that normally an individual is allowed a 15 minute break in the morning, a 15 minute break in the afternoon and a 30 minute lunch break. (Tr. 285). Mr. Gehrig stated that the numbers came from government sources which include U.S. Bureau of Census and U.S. Bureau of Labor Statistics which he retrieved from the Employment Statistics Clerk. (Tr. 286-287).

## III.  MEDICAL HISTORY

Plaintiff has been seeking medical attention from Freeport Clinic since December 17, 1993 for various complaints including sinusitis, congestion, flu and cold symptoms, allergies, fever, bladder problems, stomach and abdominal pains, and bacterial vaginitis. (Tr. 121-163, 226-229). Dr. Allen Workman was Plaintiff's attending physician at Freeport Clinic. (Tr. 126-163, 226-229). On February 14, 1994, Dr. Workman prescribed Zoloft for Plaintiff's depressive symptoms. (Tr. 123). Medical notes from May 10, 1994, indicate that the Plaintiff was doing extremely well with her depression and the Zoloft was continued. (Tr. 124). On August 12, 1994, Plaintiff's sinusitis and yeast infection had improved, but Plaintiff complained of lower back pain. (Tr. 126). From August 18, 1994 until December 12, 1995, Plaintiff was at the clinic twenty-eight times for sinus infections, vaginal infections, sore throat and flu symptoms. (Tr. 127-136).

On September 5, 1997, Dr. Workman indicated in his medical records that Plaintiff was complaining of leg pain, discomfort and achiness in the thigh and upper leg muscle. (Tr. 145). Upon examination, Dr. Workman indicated that he believed that she had sciatica.. (Tr. 145). On September 9, 1997, Plaintiff saw Dr. Workman for swelling in her hands and feet. (Tr. 145). On October 7, 1997, Dr. Workman's medical notes indicate that Plaintiff continued to experience back discomfort and pain and he recommended a CT of the lumbar spine. (Tr. 146). On October 9, 1997,

6

Plaintiff had a CT of the lumbar spine. (Tr. 147). The radiology report indicates that Plaintiff had a "focal herniation at L5-S1 which extends from the central area slightly to the left and seems to be displacing the left nerve root at that level." (Tr. 147). On October 13, 1997, Dr. Workman prescribed Medrol Dose Pak to Plaintiff. (Tr. 146). On October 17, 1997, Dr. Workman noted that Plaintiff continued to do somewhat better with her back pain and discomfort and he further noted that Plaintiff's "disc herniation appears to be doing well." (Tr. 146). On October 20, 1997, Dr. Workman recommended that Plaintiff contact the Pain Clinic to schedule an appointment for steroid injections. (Tr. 153). On October 22, 1997, Plaintiff had a lumbar epidural steroid injection performed by Dr. Juan Ibarra. (Tr. 148). Dr. Ibarra reported that the CT performed on Plaintiff on October 9, 1997, showed an "impressive disc herniation at L5-S1." (Tr. 148). On November 6, 1997, Plaintiff had a second lumbar epidural steroid injection performed by Dr. Ibarra. (Tr. 149). On November 19, 1997, upon examination of Plaintiff, Dr. Ibarra recommended an aggressive physical therapy program and he prescribed Vicodin for Plaintiff to take for occasional pain. (Tr. 150).

Plaintiff went to see a physical therapist, Greg Stanforth, on December 5, 1997. (Tr. 157). Mr. Stanforth indicated in his progress notes that Plaintiff was quite sore that day and that Plaintiff's current performance was passive. (Tr. 157). The progress notes indicate that the Plaintiff performed exercises for trunk stability and exercises for the spine. (Tr. 157). The therapist also indicated that Plaintiff missed two prior appointments, but attended six total. (Tr. 157).

On November 12, 1997, Dr. Ibarra performed a selective nerve root block of L5-S1 on Plaintiff. (Tr. 167). Following a post selective nerve root block examination on January 7, 1998, Dr. Ibarra recommended that Plaintiff continue physical therapy to build up her back and to

strengthen her lower extremities. (Tr. 152). Dr. Ibarra further noted that Plaintiff feels "significantly better" but "occasionally feels tightening type of sensation" early in the morning when she is getting out of bed. (Tr. 152).

Plaintiff continued to see Dr. Workman 7 times from November 28, 1997, to March 16, 1998, for sinus and allergy problems, congestion, flu symptoms, stomach pains and constant abdominal cramping. (Tr.153-156). Medical notes from April 14, 1998, indicate that Plaintiff was complaining of recurring back and leg pain, and tenderness over the posterior aspect of the left calf which Dr. Workman believed could be a recurrence of her nerve root compression. (Tr. 156). Dr. Workman recommended to Plaintiff that she return back to Dr. Ibarra since it had been three months or longer since the last epidural steroid injection. (Tr. 156). On April 17, 1998, Dr. Ibarra indicated in his report that he had treated Plaintiff in the past with multiple interventional pain techniques for her herniated disc pulposus. (Tr. 158). He further indicated that Plaintiff has made "good progress" and that "neurologically she is within normal limits without any significant findings." (Tr. 158). Dr. Ibarra recommended one more selective nerve root block at L5-S. (Tr. 158). On April 22, 1998, Plaintiff had a repeated selective nerve root block at L5-S. (Tr. 159). Upon follow-up examination, Dr. Ibarra indicated that Plaintiff is "asymptomatic from her sciatica" with only "occasional twinges every now and then" and Plaintiff will continue with Neurotin for six months. (Tr. 161). More recently, on November 2, 1998, Dr. Ibarra performed the last attempt of a selective nerve root block on Plaintiff. (Tr. 167).

Dr. Workman's medical notes from May 26, 1998, indicate that Plaintiff was complaining of hot flashes, hand and leg swelling and numbness. (Tr. 156). On July 6, 1998, Dr. Workman reported that Plaintiff has a variety of "myalgia symptoms" including mild hand numbness and hot

flashes. (Tr. 162). Dr. Workman recommended to Plaintiff that she have a consultation with Dr. Singh, a rheumatologist, because of her symptoms. (Tr. 163).

Upon examination of Plaintiff on August 18, 1998, Dr. Singh reported that Plaintiff stated she had a history, over several years, of her fingers swelling and tightening up in the morning. (Tr. 103). She stated that at times her feet felt the same way but that she had not noticed any tightness or any objective swelling of the joints. (Tr. 103). Dr. Singh further found that Plaintiff's general vital signs were that of an anxious 37 years old. (Tr. 104). Dr. Singh noted that there was some tenderness over the joints but no synovitis and Plaintiff's wrists, elbows, shoulders and lower extremity joints were all normal and she demonstrated excellent grips. (Tr. 104). He indicated that Plaintiff's tender trigger points were the upper thorax and the lumbosacral areas. (Tr. 104). Dr. Singh prescribed Elavil 25 mg to improve Plaintiff's sleep. (Tr. 104). Upon examination on September 15, 1998, Dr. Singh found that Plaintiff suffered from fibromyalgia and noted that he would increase her Prozac prescription. (Tr. 105).

On December 7, 1998, Dr. Galin Schram reported on the Neurological Report from the Bureau of Disability Determination Services that the Plaintiff's upper extremity was normal and her lower extremity was two with zero being no movement. (Tr. 109). Furthermore, Dr. Schram noted that the Plaintiff complained of neurological problems for two years and had steadily decreased tolerance of repetitive activity with an increase in pain, severity and occurrence. (Tr. 109). Although Plaintiff stated that just walking could be intolerable, Dr. Schram noted that Plaintiff's walking was normal and she was able to ambulate more than 50 feet without assistance. (Tr. 109).

On December 14, 1998, Dr. Singh rechecked Plaintiff for fibromyalgia. (Tr. 169). Dr. Singh noted that Plaintiff was doing fairly well, sleeping better, doing more and that she was thinking of

joining the YMCA. (Tr. 169). Moreover, Plaintiff indicated that the pain down the left leg posteriorly has resolved. (Tr. 169). Dr. Singh noted that Plaintiff would continue with Prozac in the morning and Amitriptyline at night. (Tr. 169).

On December 24, 1998, Dr. Workman wrote a letter stating that Plaintiff has ongoing back discomfort and he feels at the present time she's disabled. (Tr. 113). He recommended an orthopedic second opinion if further evaluation was necessary. (Tr. 113). On January 6, 1999, Plaintiff saw Dr. Workman because she was experiencing an upset stomach, severe heartburn and acid reflux. (Tr. 163). On January 8, 1999, Dr. Vyas examined Plaintiff and performed an upper endoscopy and biopsy. (Tr. 115-116). On January 29, 1999, Dr. Workman saw Plaintiff again because of lower back pain, and stomach discomfort. (Tr. 163,226). Dr. Workman further noted that Plaintiff was experiencing "mild achiness in the back," but there was "no acute flare-up of her pain." (Tr. 226). Dr. Workman indicated in his notes that he would prescribe Prilosec and recommend that Plaintiff slowly increase exercise and seek a dietary consultation for weight loss. (Tr. 226).

On February 8, 1999, Plaintiff saw a medical nutrition therapist, Amanda Kane RD. (Tr. 119). Ms. Kane's notes indicate that Plaintiff demonstrated good understanding of the material presented and asked many questions. (Tr. 119). On March 1, 1999, Dr. Workman ordered a gallbladder ultrasound on Plaintiff and on April 2, 1999, Plaintiff had her gallbladder removed. (Tr. 179). On May 14, 1999, Dr. Singh reexamined Plaintiff for fibromyalgia. (Tr. 238). Dr. Singh noted that Plaintiff still experienced some stiffness and some difficulty in sleeping. (Tr. 238). Plaintiff stated her hands had been swelling more lately, especially on rainy days. (Tr. 238). Dr. Singh reported that he would continue Plaintiff on the Neurontin, Elavil, Prozac, Prilosec in the morning

and Estace daily. (Tr. 238). Dr. Singh further indicated that Plaintiff's grips were fairly good and Plaintiff's hips, knees, ankles, mid feet, and toes showed no signs of synovitis. (Tr. 238). Plaintiff continued to see Dr. Workman for check-ups. (Tr. 228-229). On August 3, 1999, Plaintiff had an MRI of the lumbar spine. (Tr. 224). The radiology report indicates that there was a loss of disc hydration at L5-S1. (Tr. 224). A disc protusion which is asymmetric to the left at that level was also noted. (Tr. 224).

Dr. Singh reexamined Plaintiff on August 13, 1999, for synovitis in the hands and fibromyalgia. (Tr. 230). Dr. Singh noted Plaintiff's hands and wrists still continued to be stiff and sore and that it took about an hour for her to limber up. (Tr. 230). Dr. Singh placed Plaintiff on Celebrex to help with her hand stiffness. (Tr. 230). Dr. Singh also indicated that Plaintiff's range of motion (ROM) is somewhat limited at extreme extension and her left wrist was minimally swollen, knees minimally puffy, and hips were normal. (Tr. 230). Upon examination of the Plaintiff on August 18, 1999, Dr. David Spencer from the Spine Center reported that Plaintiff's physical examination did not reveal any "obvious positive neurologic findings." (Tr. 243). The medical report further indicated that Plaintiff did have some symptoms referable to the disc herniation but they are not necessarily severe enough to justify a microdiskectomy surgical procedure. (Tr. 243). Dr. Spencer stated that the confounding diagnosis of fibromyalgia complicates the interpretation of the magnitude of Plaintiff's symptoms due to a small disc herniation on the left at L5-S1. (Tr. 243).

On October 12, 1999, Dr. Singh reexamined Plaintiff. (Tr. 241). Dr. Singh's medical notes indicate that Plaintiff was sleeping somewhat better at night and felt better with the use of Celebrex. (Tr. 241). Plaintiff stated that her hands continue to hurt, but she demonstrated good grips. (Tr. 241). Plaintiff's wrists were minimally swollen more so on the right, ROM was complete. (Tr. 241).

Some restriction in ROM was demonstrated over both shoulders. (Tr. 241). Dr. Singh noted that Plaintiff was experiencing "no pain" or right sciatica-like symptoms." (Tr. 242). Plaintiff stated that her toes were very stiff in the morning and that her right knee had been bothering her at times. (Tr. 241).

**Mental Status Report**

On May 4, 1999, Plaintiff saw Dr. Delsie B. Gavali for a mental evaluation. (Tr. 190-192). Although Plaintiff presented signs of an adjustment disorder and avoidant personality, Dr. Gavali's medical notes indicate that Plaintiff did not seem to be in much pain, her affect was bright, and she reported that she sleeps and eats well. (Tr. 190). Dr. Gavali reported that Plaintiff was well dressed, came into the office with no cane and needed no help walking. (Tr. 191). Plaintiff informed Dr. Gavali that although she gets help with the household because she cannot bend down, she takes care of her son and is pretty much functional. (Tr. 190). Dr. Gavali reported that Plaintiff was diagnosed with fibromyalgia ten years ago but became worse this last year. (Tr. 190).

**Psychiatric Review Technique**

A Psychiatric Review was performed on the Plaintiff by Kirk W. Boyenga, Ph.D on June 3, 1999. (Tr. 201-209). In the Psychiatric Review Technique form (PRTF), Dr. Boyenga noted that Plaintiff has an adjustment problem, however, he found that it was not severe. (Tr. 201, 204). Dr. Boyenga reported that Plaintiff demonstrated a "good mental status" and has the ability to perform a "wide variety of daily activities." (Tr. 202). Dr. Boynega found no evidence of organic mental disorder, schizophrenic, paranoid and other psychotic disorder. (Tr. 203). No evidence of anxiety related disorder or somatoform disorder was demonstrated by Plaintiff. (Tr. 205). Although there was some evidence of avoidance, Dr. Boyenga found that Plaintiff did not manifest any of the following

personality disorders: evidence of seclusiveness; pathological inappropriate suspiciousness or hostility; oddities of thought, perception, speech or behavior; persistent disturbances of mood; pathological dependence, passivity or aggressivity; intense and unstable interpersonal relationships; or impulsive and damaging behavior.(Tr. 206).

Although Dr. Boyenga indicated that there is a slight degree of limitation in Plaintiff maintaining social functioning, he found that there is no limitation regarding Plaintiff's daily living activities. (Tr. 208). It is indicated that there were no significant deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner in a work setting or elsewhere. (Tr. 208). Also, there was no evidence of any episodes of deterioration or decompensation at work or in a work-like setting which would cause the Plaintiff to withdraw from that situation or to experience exacerbation of signs and symptoms. (Tr. 208).

**Residual Physical Functional Capacity Assessment**

A Residual Functional Capacity (RFC) Assessment was completed on Plaintiff on May 19, 1999. (Tr. 192). That report indicates that Plaintiff was able to lift up to 20 pounds occasionally and 10 pounds frequently, that Plaintiff could stand and/or walk for six hours in an eight-hour workday with normal breaks and sit for six hours in an eight-hour workday with normal breaks. (Tr. 192). Further, the RFC Assessment indicated that Plaintiff was able to frequently balance and crouch and occasionally climb ramps and stairs, stoop, kneel and crawl but was not able to climb ladders, ropes or scaffolds. (Tr. 195). The Assessment found no manipulative limitations, visual limitations, communicative limitations or environmental limitations with the exception of unprotected heights. (Tr. 196-197).

**IV     <u>STANDARD OF REVIEW</u>**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th

cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V.    FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986).

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that

the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time since her alleged onset date. (Tr. 11).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and forty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding.  The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments.  (Tr. 11). Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. Specifically, the ALJ found that the medical evidence established that the Plaintiff has fibromyalgia, degenerative disc disease and sero negative arthritis affecting her hands, feet and right knee. (Tr. 11).  Thus, the ALJ found these impairments to be within the meaning of "severe."  (Tr. 11).

This finding is not challenged by either party and the court finds no reason to disturb it.  The

ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 11 ). The ALJ found that there are insufficient objective findings to support a conclusion that the Plaintiff's arthritis and back impairment meets the criteria in Section 1.02 and 1.05. (Tr. 11). Even considering the combination of Plaintiff's impairments, the ALJ found that the level of severity does not equal that contemplated for any of the Appendix 1 impairments. (Tr. 11).

The ALJ indicated that Plaintiff did not satisfy section 1.05C of the listing on the basis of her herniated disc at L5-S1. (Tr. 11). Section 1.05C provides that Plaintiff must show a history of significant limitations of motion in the spine and appropriate radicular distribution and significant motor loss with muscle weakness and sensory and reflux loss. 20 C.F.R., Part 404, Subpart P, Appendix 1, §1.05C.

Plaintiff contends that she does satisfy the requirements of Section 1.05C of the Listing of Impairments. (Plaintiff's Brief at 4-5, Filed January 8, 2001). Plaintiff asserts that the ALJ did not consider the medical evidence that indicated Plaintiff has a herniated disc, pain, spasm, limitation of motion, and radicular distribution. (Plaintiff's Brief, pg. 4-5). A review of the ALJ's findings demonstrates that the ALJ did consider all the available evidence provided by Plaintiff. Plaintiff's most recent physical examination was on October 12, 1999, by Dr. Singh in which he noted that Plaintiff informed him that she had "no pain" or "right sciatica-like symptoms." (Tr. 241). Also on August 18, 1999, Dr. David Spencer, a back specialist, performed an examination on Plaintiff where

he reported that Plaintiff's examination did not reveal any "obvious neurologic findings." (Tr. 243). Moreover, on January 29, 1999, Dr. Workman noted that Plaintiff was experiencing "mild achiness" in her back but there was "no acute flare-up" of her pain. (Tr. 163, 226). The medical evidence fails to demonstrate that Plaintiff has <u>significant</u> limitation of motion in the spine and appropriate radicular distribution of <u>significant</u> motor loss with muscle weakness and sensory and reflex loss as required by Section 1.05C.

Although Plaintiff did not initially allege a disability on the basis of a mental disorder, Plaintiff asserts in her brief that she has a depression which meets or equals §12.04 of the Listings. (Plaintiff's Brief, pg. 5). However, after reviewing all the available medical evidence, Plaintiff does not meet or equal the requirements listing under §12.04. <u>See</u>, 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04. As stated earlier, Plaintiff underwent a psychiatric review on June 3, 1999. (Tr. 201-209). The PRTF indicates that Plaintiff's mental status was good and that her "current mental impairment was not severe." (Tr. 202). Although, Plaintiff displayed some signs of avoidant problems, she did not demonstrate any other personality disorders and Dr. Boyenga found that she is capable of performing daily activities. (Tr. 202, 205).

Plaintiff further claims that the ALJ made an impermissible medical judgment when she rejected Dr. Allen Workman's medical opinions. (Plaintiff's Brief, pg. 9). Plaintiff relies on two letters written by Dr. Workman expressing that Plaintiff "could not work and was disabled." (Plaintiff's Brief, pg. 8-9). The ALJ found that Dr. Workman's opinions regarding Plaintiff being disabled was contrary to the medical evidence. (Tr. 15). This Court has found that the ALJ made a thorough review of the available medical records and her decision is supported by the evidence. For example, on December 24, 1998, Dr. Workman indicated in a letter that Plaintiff was disabled.

However, when Dr. Workman saw Plaintiff in his office on January 29, 1999, he reported that Plaintiff was experiencing "mild achiness" in her back, but there was "no acute flare-up of her pain." (Tr. 226). Also, when Dr. Singh examined Plaintiff on August 12, 1999, he indicated that Plaintiff was experiencing "no pain in her back." (Tr. 242). After taking into consideration all the medical evidence, including Dr. Workman's opinions, the ALJ concluded that Plaintiff was not disabled and there is not enough medical evidence to support otherwise. (Tr. 15). There is nothing to indicate that the ALJ is substituting her own medical judgment for that of Dr. Workman's opinions.

Finally, Plaintiff asserts that because the ALJ did not mention David Kohlbauer's testimony in her final decision, the ALJ failed to give proper consideration to all testimonial evidence. (Plaintiff's Brief, pg. 10-11). However, this Court has found that the ALJ considered all evidence and made a reasonable conclusion regardless of whether or not she mentioned every piece of evidence or testimony in her decision.

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. (Tr. 15). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's Residual Functional Capacity did not allow her to perform the full range of light work, there existed a significant number of jobs in the national economy that she can perform. (Tr.16). The ALJ found that Plaintiff's RFC permitted her to perform the requirements of work except for: lifting more than 20 pounds occasionally or 10 pounds frequently; climbing ropes, scaffolds and ladders; bending more than occasionally; crouching even occasionally; working without an opportunity to change positions for a few minutes every hour; and performing tasks requiring repetitive, forceful gripping with her hands or rapid dexterity. (Tr. 17). In response to the ALJ's questions, the vocational expert, Ronald Gehrig, testified that a hypothetical person with Plaintiff's impairments could perform in sedentary and light positions that include sales counter clerk, cashier, receptionist, payroll clerk, order clerk and dispatcher. (Tr. 281-288).

Plaintiff asserts that the Commissioner did not meet the burden of proof as required under Step Five. Plaintiff contends that Mr. Gehrig was confused when asked hypothetical questions and misstated facts. First, Plaintiff argues that Mr. Gehrig was confused when the ALJ asked a hypothetical question about whether there were available jobs for an individual with certain limitations who "cannot do repetitive forceful gripping or do work that requires rapid finger dexterity." Plaintiff argues that Mr. Gehrig misunderstood the hypothetical question by thinking that the ALJ required him to assume "restrictions of repetitive hand movement". However, after reviewing the transcript, it is clear that the ALJ elucidated the hypothetical by repeating to Mr. Gehrig, "I said repetitive forceful gripping or rapid finger dexterity;" thereby, clarifying any misunderstandings. (Tr. 283). It appears clear from the transcript that Mr. Gehrig understood the hypothetical question and answered it without any confusion.

Second, Plaintiff argues that Mr. Gehrig provided inaccurate information during the hearing. Plaintiff claims that Mr. Gehrig's information regarding the skill level of the available jobs was incorrect. In his testimony, Mr. Gehrig stated that the available jobs that he identified were all unskilled positions. (Tr. 283-286). However, Plaintiff maintains that many of these jobs were skilled or semi-skilled jobs as opposed to unskilled jobs. Plaintiff relies on the *Dictionary of Occupational Titles* to support his argument. (Plaintiff's Brief, pg. 13-14). However, Plaintiff does not cite to any specific edition or section, or demonstrate any inconsistencies between the information that Mr. Gehrig provided and that provided in DOT. The ALJ reasonably relied on Mr. Gehrig's testimony as permitted under *20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2*. Also, the ALJ specifically noted that she used rule 202.20 of the *Medical-Vocational Guidelines* as a supplemental aid for her decision. (Tr. 16).

Plaintiff further asserts that the number of available jobs identified by Mr. Gehrig included part-time positions. But when asked whether these jobs included part-time employment, Mr. Gehrig testified twice that the numbers included only full-time positions. (Tr. 286). The ALJ specifically noted that even assuming for purposes of discussion, the total number of available jobs included part-time positions, the ALJ found that by reducing the total number of available jobs by 50 percent to account for part-time employment, the remaining available positions still represented a significant number of jobs in the state of Illinois. (Tr. 16).

In determining a mental RFC, the first step in the procedure is to assess the nature and extent of the claimant's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the Mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity

23

of the impairment over a period of time. (20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)). This information is then used to complete claimant's vocational assessment.

Plaintiff underwent a psychological evaluation on May 4, 1999 and June 3, 1999. (Tr. 190-192, 201-202). Although the evaluations indicated that Plaintiff has an adjustment problem, these reports also indicated that her current mental impairment was not severe. (Tr. 201-202). The ALJ noted that Dr. Gavali reported on May 4, 1999, that Plaintiff's mental status was good, her affect was bright and she was oriented. (Tr. 14). Moreover, the ALJ noted that Plaintiff was able to perform Serial 7s accurately and was able to perform digit span forwards and backwards. (Tr. 14). The psychological evaluations indicate that Plaintiff is not mentally limited in her ability to perform basic work functions.

Finally, Plaintiff asks this court to remand this matter for a new hearing because she contends that the ALJ should have contacted Dr. Allen Workman to obtain clarifying information about why he concluded Plaintiff to be disabled. The medical records that were provided for the case at bar included Dr. Workman's progress notes from December 17, 1993, until October 26, 1999. After reviewing of all the medical records, there is no indication that any of Plaintiff's medical records contained inadequate information or that the ALJ did not have sufficient information to warrant her decision. Therefore, Plaintiff's request for a rehearing is denied.

## VII. CONCLUSION

For the above reasons this Court recommends that Defendant's Motion for Summary Judgment be granted and Plaintiff's Motion for Summary Judgment be denied.

ENTER:

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**

**UNITED STATES DISTRICT COURT**

DATE: 7/10/01